No. 984.

SUCCESSION OF EDWARD HERRON. ON OPPOSITIONS TO FINAL ACCOUNT.

An Opponent to the Account of an Administrator, who has not appealed from the judgment of the lower Court, and who is not Appellee either, cannot be heard in this Court asking for an amendment of the judgment.

It is too late to urge an objection to the legality of the appointment of an Administrator, in an Opposition to his final Account, when it appears that he was regularly appointed by a competent Court.

When the sale of Succession property was legally ordered and made, and the Administrator received the price thereof in Confederate money, which was then the only currency in the State, he cannot be held liable for the said price in any other than the same Confederate money. Decision in Succession of Womack, 29 An. 579, affirmed.

APPEAL from the Fifth Judicial District Court, parish of Ouachita. Richardson, J.

Stubbs & Stillman for Opponents and Appellees :

First—An administration is unnecessary when there are no debts.

Second—If such an estate is administered, and to its material injury, the administrator is liable personally for his acts of maladministration.

Third—An administrator who forces a protracted administration of over sixteen years of an estate perfectly solvent and owing no debts, and who fails to file a single annual account of his gestion within that period, should be compelled to pay interest at ten per cent per annum on sums in his hands, from a period one year subsequent to the time of his receiving and failing to account for them down to their payment.

Cobb & Gunby for the Administrator, Appellant :

First—When the administrator of a succession, opened during the war, received Confederate money, the only currency in circulation, for the price of personal property sold at succession sale, and afterwards distributed the pro rata share of the proceeds to seven of eight heirs, the eighth being a minor, to whom, on attaining her majority, her pro rata is tendered in Confederate currency, and refused, the loss should fall on the latter, and not on the administrator, if he is shown to have done his duty.

Second—When what is known as "currency," or current money, is received by one acting in a fiduciary capacity, it is not necessary for him to keep the specific bills or coins received, but it will suffice to tender a like amount of such currencey. *Aliter*, when uncurrent money or property is received by such fiduciary. Succession of Womack, 29 An. 579.

The opinion of the Court was delivered by

Todd, J.    Edward Herron died in Ouachita parish in January, 1863, leaving an estate appraised at $7611 25, of which $2811 25 was personal property, and a number of heirs, some of whom were minors.

Shortly after his death, David McQuiller, a son-in-law of the deceased, was appointed administrator of his succession; and soon after his appointment caused to be sold, under an order of court, all the personal property belonging to the succession. The sale was for Confederate money. The shares of the heirs of age in this money was paid over to them by the administrator, and their receipts taken for the same. The land was partitioned among all the heirs.

On the 25th of August, 1879, David McQuiller, at the instance of the two of the heirs of deceased parties to the present proceeding, rendered an account of his administration of said succession, showing a balance due by the succession to him of $172 31. This account was opposed by Catherine E. Herron, wife of R. A. Phillips, and R. A. Phillips, tutor of the minor, Mary E. Phillips, child of Louisa V. Herron, deceased, who was a daughter of Edward Herron, deceased.

The grounds of the opposition were substantially these: That there were no debts owing by the succession, and that the appointment of an administrator was unnecessary; that there was no necessity for the sale of the personal property, and that the administration was unwarranted and injurious to the succession. Opposition was made, also, to several credits claimed by the accountant.

There was judgment rendered in favor of the tutor of Mary E. Phillips for ninety-five dollars, with five per cent interest from the 16th May, 1867; and from this judgment the administrator has appealed.

The opponents have asked in this Court an amendment of the judgment. This judgment was only in favor of one of the opponents (Mary E. Phillips), and the silence of the judgment as to the claim or opposition of the other opponent, Catherine E. Herron, is equivalent to its rejection. She did not appeal from this judgment, and the administrator is appellant only from the judgment against him in favor of the opponent, Mary E. Phillips. The other opponent, Catherine E. Herron, being neither appellant nor appellee, has no right to be heard before this Court, nor ask for an amendment of the judgment. 6 L. 228; 8 L. 192; 14 A. 564; Boutté vs. Boutté, 29 A., N. R.

It is too late to urge an objection to the legality of the appointment of an administrator in an opposition to his final account, when it appears that the appointment was regularly made by a competent court, and the succession has been fully administered.

In this case the evidence shows that there were some debts owing by the succession, though small, it is true, compared with the property.

It has, however, been held by this Court, that "even if there be no debts, the appointment of an administrator may sometimes be advantageous, and even necessary. The propriety of subjecting successions to such a charge must rest in the judge's discretion on the facts before him." 3 A. 502.

And again: "That where several of the heirs were minors, for whom the succession could only be accepted with the benefit of inventory, in such cases the Code specially authorizes the appointment of an administrator." Dees vs. Tildon, 2 A. 412. See, also, 2 L. 299; 7 R. 24.

Without expressing our entire concurrence in the decisions from which we have quoted, we are satisfied that the legality of McQuiller's appointment cannot be questioned in this proceeding.

Nor can the sale of the personal property complained of be successfully attacked at this late day and under this form of proceeding.

The sale was not opposed at the time by the heirs of age, nor by the tutor of the opponent, who was then a minor; but, on the contrary, the evidence in the record shows that it was approved by all parties interested. Besides, when we consider the situation at the time this sale was made, and all the facts, circumstances, and surroundings connected with it, we are not prepared to condemn the sale as unnecessarily or illegally made. In regard to the condition of affairs at that time, we find the testimony in the record of the most respectable witnesses. Among others, Judge Robert Ray, on the trial of the case, was called as a witness for the opponents, and we quote from his testimony as follows:

"I suppose it would have been the best thing that could have been done with personal property belonging to an estate to have sold it, and not tried to keep it, especially such things as could be taken by armies. * * During that year the country was filled with troops, and, I believe, in 1863 a raid was made, and they swept away every thing like hogs and cattle; and if one army had respected it, the other would not."

And J. W. Scarborough, a neighbor of the administrator, and an old citizen of the parish of Ouachita, of the very highest respectability, stated on the trial:

"I think it would not have been safe for an administrator to have attempted to keep the personal property at that time, because the personal property of the succession of Herron was perishable property, and without personal attention would certainly have gone to waste. It would have cost nearly as much to have kept the property as it was worth.

"The personal property belonging to people living in that part of the country, including mules, cattle, etc., was taken from them by one or the other armies as they occupied the country.

"As a prudent administrator and man, I think Mr. McQuiller acted right in the course he took in selling the property as soon as possible. I think I advised him to this course myself."

This testimony, and that of other witnesses to the same effect in the record, is uncontradicted.

Under these circumstances, and with these facts before us, we must conclude that the sale was not improperly or illegally made. C. C. 1051, 1162.

If the sale was proper, it could only be made for Confederate money, as that was the only currency in circulation, and its circulation enforced by public sentiment, and indirectly by the legislation and action of the only government which then exercised authority in the State, and possessed the power to compel obedience to its laws.

The administrator was then practically compelled to receive Confederate money for the property sold; and having thus received it, and it having become worthless in his hands, it would be abhorrent to our sense of justice to compel him to pay to either heirs or creditors gold, silver, U. S. currency, or, in fact, any other money than he received. The loss must be theirs, not his, as was well said by our immediate predecessors in 29 A. 579, Succession of Womack:

"The sale of the movables was a necessity. Witness says they or their value would have been lost if they had not been sold. There was but one currency in which the administrator could be paid at that time. The court that ordered the sale knew that. No other money could have been permitted to pass current by the government that dominated the country where these proceedings took place, and the use of force was not needed to effectuate this policy. A spontaneous and clamorous public sentiment supplemented and supported the financial policy of that government. The administrator could have done nothing but receive the Confederate currency, and there is no pretense that he derived advantage from its use. It perished in his hands. He ought not to be held responsible for it."

The present case is plainly within the purview of this decision.

It is shown that the only money other than Confederate money that ever came into the hands of the administrator was fifty-seven dollars and seventy-five cents in gold and silver, mentioned in the inventory; and the evidence shows that he paid out more than this sum for the estate, after the termination of the war, in United States currency.

Since it is shown that the entire fund received by the administrator, with the exception mentioned, was in Confederate money, it would be idle in us to discuss whether this fund was properly distributed, and whether the objections raised by the opponents to some of the credits claimed for alleged payments made were just or not.

It is shown that the administrator tendered to the mother of opponent, who was herself a minor at the time of the death of Edward Herron, when she became of age, her share of the Confederate money received by him, which she declined to receive, but in so declining, according to the evidence in the record, she recognized that it was her loss, and not the administrator's.

With these views of the issues embraced in this case, and of the legal principles involved, we conclude that there was no liability on the part of the administrator to the opponent for any amount.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be annulled, avoided, and reversed; that the opposition of the opponent, Richard A. Phillips, tutor of the minor, Mary E. Phillips, be dismissed, and that in other respects the judgment of the lower court remain undisturbed; opponent to pay costs of opposition in both courts.